**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1817
_____

UNITED STATES OF AMERICA

v.

WILLIAM E. BARONI, JR.,
                    Appellant
_____

No. 17-1818
_____

UNITED STATES OF AMERICA

v.

BRIDGET ANNE KELLY,
                    Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 2-15-cr-00193-001 and 2-15-cr-00193-002)
District Judge: Honorable Susan D. Wigenton
_____

Argued: April 24, 2018

Before: AMBRO, SCIRICA, and SILER, JR.[♦], *Circuit Judges*.

(Opinion Filed: November 27, 2018)

Syed Y. Latifi
Matthew J. Letten
Michael A. Levy      **[ARGUED]**
Michael D. Mann
Nicholas M. McLean
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

   *Counsel for Appellant Baroni*

Henry W. Asbill
BuckleySandler
1250 24th Street, N.W.
Suite 700
Washington, DC  20037

Jacob M. Roth      **[ARGUED]**
Charlotte H. Taylor
Jones Day
51 Louisiana Avenue N.W.
Washington, DC 20001

---

[♦] Honorable Eugene E. Siler, Jr., United States Court of Appeals for the Sixth Circuit, sitting by designation.

Michael D. Critchley
Critchley, Kinum & Denoia, LLC
75 Livingston Avenue
3rd Floor
Roseland, NJ 07068

     *Counsel for Appellant Kelly*

Mark E. Coyne
Bruce P. Keller    **[ARGUED]**
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

     *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

**SCIRICA**, *Circuit Judge*

Defendants William E. Baroni, Jr. and Bridget Anne Kelly engaged in a scheme to impose crippling gridlock on the Borough of Fort Lee, New Jersey, after Fort Lee's mayor refused to endorse the 2013 reelection bid of then-Governor Chris Christie. To this end, under the guise of conducting a "traffic study," Baroni and Kelly, among others, conspired to limit Fort Lee motorists' access to the George Washington

Bridge—the world's busiest bridge—over four days in early September 2013: the first week of Fort Lee's school year. This scheme caused vehicles to back up into the Borough, creating intense traffic jams. Extensive media coverage ensued, and the scandal became known as "Bridgegate."

In 2015, a grand jury indicted Baroni and Kelly for their role in the scheme. Each Defendant was charged with seven counts: conspiracy to obtain by fraud, knowingly convert, or intentionally misapply property of an organization receiving federal benefits, 18 U.S.C. § 371, and the substantive offense, *id.* § 666(a)(1)(A); conspiracy to commit wire fraud, *id.* § 1349, and two counts of the substantive offense, *id.* § 1343; and conspiracy against civil rights, *id.* § 241, and the substantive offense, *id.* § 242. A jury convicted Defendants on all counts. They appeal only their judgments of conviction.

For reasons that follow, we will affirm Defendants' judgments of convictions on the wire fraud and Section 666 counts but will reverse and vacate their civil rights convictions.

# I.[1]

In 2010, then-New Jersey Governor Chris Christie appointed Baroni to serve as Deputy Executive Director of the

---

[1] Because Defendants were convicted at trial and raise sufficiency challenges, "we review the evidence in the light most favorable to the government." *United States v. Hodge*, 870 F.3d 184, 204 (3d Cir. 2017). The facts of this case are not materially in dispute.

Port Authority of New York and New Jersey. That same year, David Wildstein—a cooperating witness in this case[2]—was hired to serve as the Port Authority's Director of Interstate Capital Projects, in which capacity he functioned as Baroni's chief of staff.

Among its many functions, the Port Authority operates the George Washington Bridge, a double-decked suspension bridge connecting the Borough of Fort Lee, New Jersey, and New York City across the Hudson River. On the bridge's upper deck, twelve toll lanes carry traffic from New Jersey into New York. During the morning rush hour, Port Authority police place traffic cones to reserve the three right-most lanes—the "Special Access Lanes"—for local traffic from Fort Lee. This leaves the other nine lanes for drivers on the "Main Line," which includes traffic from I-80 and I-95. This practice of reserving Special Access Lanes was a decades-long custom dating back to a political deal between a former New Jersey governor and Fort Lee mayor.

Wildstein testified he first became aware of the Special Access Lanes in March 2011. He learned the three lanes were given to Fort Lee by a former New Jersey governor to reduce local traffic and "immediately thought that this would be . . . a potential leverage point with [Fort Lee] Mayor [Mark] Sokolich down the road." Joint App'x (J.A.) 1596. Wildstein

---

[2] Pursuant to a cooperation plea agreement, Wildstein pled guilty on May 1, 2015, to an Information charging him with one count of conspiracy to obtain by fraud, knowingly convert, and intentionally misapply property of an organization receiving federal benefits, 18 U.S.C. § 371, and one count of conspiracy against civil rights, *id.* § 242.

5

shared this observation with Baroni, Governor Christie's then-Chief of Staff Bill Stepien, and Kelly, then the Deputy Chief of Staff for New Jersey's Office of Intergovernmental Affairs (IGA). Wildstein did not, however, use the Special Access Lanes as leverage at that time.

Around the same time that Wildstein realized the Special Access Lanes could be used as leverage, IGA officials—including Kelly—were discussing a plan to solicit endorsements from Democratic elected officials to generate bipartisan support for Governor Christie's 2013 re-election bid. IGA officials rewarded potential endorsers with, among other things, "Mayor's Days" (meetings with top departmental and agency staff) and invitations to sporting events, breakfasts and parties at Drumthwacket (the Governor's Princeton residence), and the Governor's State of the State address.

The Governor's Office and IGA used the Port Authority similarly to bestow political favors on potential endorsers. As Wildstein explained at trial, the Port Authority "was viewed as the economic engine of the region" and "had an ability to do things for Democratic officials that would potentially put the Governor in a more favorable position." J.A. 1522–23. Baroni and Wildstein were thus asked "to assist the Governor's Office in identifying opportunities that would be helpful." J.A. 1523. The Port Authority gave benefits ranging from gifts (e.g., steel from the original World Trade Center towers, flags that had flown over Ground Zero, framed prints) and tours, to jobs, to large economic investments (e.g., the $250 million purchase of the Military Ocean Terminal at Bayonne).

One Democratic endorsement sought by the Governor's Office was that of Mayor Sokolich. IGA invited Sokolich to a

6

New York Giants game, several holiday parties, and one of Governor Christie's budget addresses. And, as early as 2010, the Governor's Office and IGA directed Wildstein to leverage the Port Authority's resources to obtain Sokolich's endorsement. Sokolich received benefits ranging from the sort of gifts described above to substantial Port Authority assistance for Fort Lee (e.g., Port Authority Police assistance directing traffic in Fort Lee, a $5,000 contribution to the Fort Lee fire department for an equipment purchase, and over $300,000 in funding for four shuttle buses providing Fort Lee residents with free transport between ferry and bus terminals). Despite that, Sokolich informed IGA in 2013 that local political considerations precluded him from endorsing the Governor's reelection bid.

In June 2013, Kelly told Wildstein that she was disappointed Sokolich would not be endorsing Governor Christie, and Wildstein reminded her "if she want[ed] the Port Authority to close down those Fort Lee lanes to put some pressure on Mayor Sokolich, that that c[ould] be done." J.A. 1605. On August 13, 2013, Kelly sent an email to Wildstein that read: "Time for some traffic problems in Fort Lee." Supplemental App'x (S.A.) 42. Wildstein "understood that to mean it was time to change the lane configurations, the upper level of the George Washington Bridge in order to create traffic in the Borough of Fort Lee." J.A. 1612. Wildstein testified that, on a follow up telephone call, Kelly told him that "Mayor Sokolich needed to fully understand that life would be more difficult for him in the second Christie term than it had been [i]n the first." J.A. 1620. Wildstein admitted at trial that he agreed to change the lane configuration "[f]or the purpose of causing—of punishing Mark Sokolich, of creating a traffic jam

that would punish him, send him a message," and that there was no other reason for the change. J.A. 1621.

Wildstein testified he told Baroni he "received an email from Miss Kelly that [he] viewed as instructing [him] to begin to put leverage on Mayor Sokolich by doing a lane closure." J.A. 1618. He also testified he told Baroni "that Miss Kelly wanted the Fort Lee lanes closed . . . [f]or the purpose of punishing Mayor Sokolich . . . [b]ecause he had not endorsed Governor Christie" and that "Mr. Baroni was fine with that." J.A. 1623.

According to Wildstein, he decided "to create the cover of a traffic study" and shared his plan with both Baroni and Kelly. J.A. 1624. Wildstein believed "calling it a traffic study would provide a cover story for the true purpose of changing and realigning that traffic pattern at the bridge" and "to have a public policy reason for doing so as opposed to saying it was political and it was punitive and revealing the true purpose."[3]

---

[3] Baroni's position at trial and on appeal has been that "[a]t no point did Wildstein tell [him] that the purpose of realigning the lanes was political payback rather than to conduct a legitimate traffic study." Baroni Br. at 14 n.4. While "Baroni acknowledges that Wildstein's testimony alone is legally sufficient to permit a jury to conclude otherwise," he contends "Wildstein committed perjury at trial." *Id.* We cannot discount Wildstein's testimony—which the jury evidently credited— "for it is the exclusive province of the jury . . . to decide what facts are proved by competent evidence," and "also their province to judge . . . the credibility of the witnesses . . . and the weight of their testimony." *Ewing's Lessee v. Burnet*, 36

J.A. 1632. In furtherance of Defendants' traffic study cover story, Wildstein contacted Peter Zipf, the Port Authority's chief traffic engineer, and told him he wanted to take away the cones that created the Special Access Lanes "so that New Jersey could determine whether those three lanes given to Fort Lee would continue on a permanent basis." J.A. 1657–58. Zipf responded later that day with various proposals but recommended that at least one segregated lane be left in place to prevent sideswipe crashes.

According to Wildstein, he and Baroni discussed when to implement the lane closure at the end of August 2013, and they selected Monday, September 9, 2013—the first day of school in Fort Lee. But Wildstein waited to give the instruction until Friday, September 6. He testified "[i]t was a deliberate effort on [his] part to wait until the last minute to give a final

U.S. (11 Pet.) 41, 50–51 (1837); *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) ("[W]e 'must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury.'" (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)) (omission and second alteration in original)). But we observe that, in fashioning Baroni's sentence, the District Judge applied a Guidelines enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, in part because she found Baroni attempted "to mislead the jury in this case regarding [his] role in this conspiracy." J.A. 5678. The trial judge concluded Baroni committed perjury at trial when he "continued to maintain the traffic study was legitimate when [he] clearly knew . . . that it was not." *Id.* For similar reasons, Kelly also received this enhancement.

instruction so that nobody at the Port Authority would let Fort Lee know, would communicate that to Fort Lee or anyone else within the Port Authority," including Executive Director Patrick Foye. J.A. 1684. According to Wildstein, he discussed waiting to give the instruction with both Baroni and Kelly, who agreed. This directly contravened normal Port Authority protocol, with any lane closures announced to the public weeks, and even months, in advance.

Wildstein gave the instruction to Zipf and two other Port Authority managers, Bob Durando (the general manager of the George Washington Bridge) and Cedric Fulton (the director of Tunnels, Bridges & Terminals), again claiming that New Jersey wanted to see whether the Special Access Lanes would remain permanent. When Fulton asked if Foye knew, Wildstein lied and said he did. Wildstein later told the same lie to Durando.

Durando explained that because only one Special Access Lane would remain open, the Port Authority needed to pay an extra toll collector to be on relief duty for that sole toll collector. Wildstein discussed this with Baroni and Kelly, and none of the three saw a problem with this extra cost. Wildstein and Zipf also discussed collecting data on the ensuing traffic, and Wildstein testified he understood it would require "some staff time." J.A. 1688.

On the morning of Monday, September 9, Port Authority police placed traffic cones two toll booths to the right of where they were customarily placed on the upper deck, thereby reducing the number of Special Access Lanes from three to one, and increasing the number of Main Line lanes from nine to eleven. This realignment meant that Fort Lee's

10

sole remaining Special Access Lane had to accept both cash and E-ZPass, further delaying traffic. As discussed, Fort Lee received no advance warning of the change—contrary to the Port Authority's standard procedures.

As a result of this change, cars attempting to cross the George Washington Bridge during the morning commute backed up into Fort Lee and gridlocked the entire town. Mayor Sokolich repeatedly attempted to contact Baroni and IGA to have the two other Special Access Lanes reinstated, but Baroni deliberately did not respond. Wildstein testified "that was the plan that [he] had come up with along with Mr. Baroni and Miss Kelly, which is that all calls would be directed to Mr. Baroni. And that Mr. Baroni would be radio silent. Meaning any—all the calls would come to him, and he wasn't planning on returning any of them." J.A. 1687–88.

On the morning of September 9, Mayor Sokolich called Baroni's office about an "urgent matter of public safety in Fort Lee," but received no response. S.A. 51. The Fort Lee borough administrator also called to say Fort Lee police and paramedics had difficulty responding to a missing child and a cardiac arrest. The next day, the mayor called again, saying the traffic was a "life/safety" issue and that paramedics had to leave their vehicle and respond to a call on foot. S.A. 54. Receiving no response to his calls, he then sent Baroni a letter on September 12 detailing the negative impact on public safety in Fort Lee. Kelly was similarly unmoved by the traffic and the anger it generated, reportedly smiling when a colleague at IGA informed her of the situation.

Executive Director Foye first learned of the realignment on the evening of Thursday, September 12. The following

morning, he sent an email to Baroni and others, criticizing the "hasty and ill-advised" realignment and ordering the restoration of the prior alignment with three Special Access Lanes. J.A. 1100–02, 5809. Baroni went to Foye's office and asked that the realignment be put back into effect, with only one Special Access Lane for Fort Lee. Foye testified Baroni said the issue was "important to Trenton," which Foye understood to reference the Governor's Office. J.A. 1107–08. Foye refused to do so. Baroni returned to Foye's office later that day, again asked that two of Special Access Lanes be taken away from Fort Lee, and said the issue was "important to Trenton" and "Trenton may call." J.A. 1109. Foye held firm and continued to refuse. Wildstein testified Baroni reached out to David Samson, the New Jersey-appointed Chairman of the Port Authority, to "overrule Mr. Foye and talk to others on the New York side," but Samson ultimately declined to do so, instead recommending Baroni "let it go." J.A. 1832.

In response to significant public backlash, Baroni and Wildstein began preparing a report that would describe what happened as "a traffic study to determine whether it was fairer to give three lanes to Fort Lee." J.A. 1870. The report would also have admitted that the Port Authority had failed to give Fort Lee appropriate notice due to an alleged "communications breakdown." J.A. 1870. But the report was never released because Port Authority staff were asked to testify before the New Jersey State Assembly. *See* J.A. 1879–80. Wildstein helped Baroni prepare his testimony, which was based on the draft report and the traffic study and "fairness" rationale.

Then-Governor Christie fired Wildstein on December 6 and Baroni on December 12. Kelly was fired on January 9,

12

2014.  A federal criminal investigation followed and resulted in the underlying prosecution.

## II.

On April 23, 2015, a federal grand jury returned a nine-count indictment, charging Defendants with seven counts each.

In Count 1, the grand jury charged Defendants with conspiracy to obtain by fraud, knowingly convert, or intentionally misapply property of an organization receiving federal benefits.  18 U.S.C. § 371.  As charged, "[t]he object of the conspiracy was to misuse Port Authority property to facilitate and conceal the causing of traffic problems in Fort Lee as punishment of Mayor Sokolich."  J.A. 96.  In Count 2, Defendants were charged with the substantive offense of that conspiracy.  The grand jury alleged Defendants, through Port Authority agents Baroni and Wildstein, "obtained by fraud, otherwise without authority knowingly converted to their use and the use of others, and intentionally misapplied property owned by and under the care, custody, and control of the Port Authority, with a value of at least $5,000."  J.A. 119; 18 U.S.C. §§ 666(a)(1)(A), 2.

In Count 3, Defendants were charged with conspiracy to commit wire fraud.  18 U.S.C. § 1349.  The charged "object of the conspiracy was to obtain money and property from the Port Authority and to deprive the Port Authority of its right to control its own assets by falsely representing and causing false representations to be made that the lane and toll booth reductions were for the purpose of a traffic study."  J.A. 120.  In Counts 4 through 7, the grand jury charged each Defendant with two substantive wire fraud violations.  18 U.S.C. §§ 1343,

13

2. Count 4 pertained to Kelly's August 13, 2013 email informing Wildstein it was "[t]ime for some traffic problems in Fort Lee," and Count 6 to her September 9, 2013 email thanking Wildstein for confirming there would be "[r]adio silence" from Baroni in response to Mayor Sokolich's inquiries. J.A. 123 (second alteration in original). Counts 5 and 7 related to Baroni's September 9 and 12, 2013 emails to Wildstein concerning complaints from Mayor Sokolich.

In Count 8, the grand jury charged Defendants with conspiracy against civil rights. 18 U.S.C. § 241. The charged "object of the conspiracy was to interfere with the localized travel rights of the residents of Fort Lee for the illegitimate purpose of causing significant traffic problems in Fort Lee to punish Mayor Sokolich." J.A. 124. In Count 9, Defendants were charged with the substantive violation. 18 U.S.C. §§ 242, 2.

At the outset, Defendants moved to dismiss all the charges. *See* Fed. R. Crim. P. 12(b)(3)(B). The District Judge held oral argument and denied the motions. After a six-week trial, the jury found Defendants guilty on all counts. Defendants moved for judgments of acquittal, *see* Fed. R. Crim. P. 29, and for a new trial, *see* Fed. R. Crim. P. 33. Again, the trial judge denied the motions. She then sentenced Baroni to 24 months' imprisonment and Kelly to 18 months' imprisonment. Defendants, who are free on bail pending this appeal, challenge only their judgments of conviction.[4]

---

[4] The trial court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over Defendants' appeal of their judgments of conviction under 28 U.S.C. § 1291.

**III.**

Defendants challenge the sufficiency of the evidence supporting their wire fraud and Section 666 convictions.

"We exercise plenary review over a district court's grant or denial of a motion for judgment of acquittal based on the sufficiency of the evidence," *United States v. Willis*, 844 F.3d 155, 164 n.21 (3d Cir. 2016), and we apply the same standard as the district court, *see United States v. Ferriero*, 866 F.3d 107, 113 n.4 (3d Cir. 2017) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "A judgment of acquittal is appropriate under Federal Rule of Criminal Procedure 29 if, after reviewing the record in a light most favorable to the prosecution, we determine that no rational jury could have found proof of guilt beyond a reasonable doubt." *Willis*, 844 F.3d at 164 n.21. Where sufficiency arguments give rise to questions of statutory interpretation, our review is also plenary. *See Ferriero*, 866 F.3d at 113 n.4.

**A.**

Defendants challenge the sufficiency of the evidence underlying their wire fraud convictions. "A person violates the federal wire fraud statute by using interstate wires to execute 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Ferriero*, 866 F.3d at 120 (quoting 18 U.S.C. § 1343). Conspiracy to commit wire fraud is a separate crime subject to the same penalties as the substantive offense. *See* 18 U.S.C. § 1349.

15

The Government's theory at trial was that Defendants sent emails in furtherance of, and to execute, a scheme to defraud the Port Authority of physical property (i.e., the Special Access Lanes and toll booths) and money (i.e., public employee labor) in order to carry out the lane reductions. In summation, the Government explained this was the "same money, the salaries, the same property, the lanes, the toll booths," that it alleged Defendants fraudulently obtained, knowingly converted, or intentionally misapplied in violation of 18 U.S.C. § 666. J.A. 5195. The Government explained:

> The physical property that was misused were the local access lanes, themselves, and the toll booths. . . . The defendants agreed to use these Port Authority assets, that property, to purposely create a traffic jam in Fort Lee. That agreement was not a legitimate use of the George Washington Bridge, the Port Authority's property.

J.A. 5193–94. The Government identified the "money" as "the salaries of each of the employees who wasted their time in furtherance of the defendants' scheme," including "the salary paid to the overtime toll booth collectors for the one remaining toll booth that was accessible to Fort Lee," "the money paid to Baroni and Wildstein themselves while they . . . [were] wasting their time in furtherance of this conspiracy," and "money paid to the engineers who wasted time—and Port Authority professional staff, who wasted time collecting data that no one ever wanted." J.A. 5194. The Government also invoked the costs the Port Authority incurred in redoing a legitimate traffic study—at Center and Lemoine Avenues in Fort Lee—that was

16

spoiled by the gridlock and "would not have been ruined without these lane reductions." J.A. 5296.

According to the Government, Defendants' untruthful claim they were conducting a traffic study was what allowed them to carry out the lane reductions and to obtain the Port Authority property and money necessary to do so. The Government also contended Defendants conspired with each other and Wildstein in furtherance of this fraudulent scheme.

Defendants argue the evidence was insufficient to prove a scheme to defraud because (1) Baroni possessed unilateral authority over Port Authority traffic patterns and any resources necessary to implement his decisions, and (2) the Port Authority was not deprived of any property right. In addition to these challenges, Defendants contend the Government has disguised an impermissible honest services fraud case as a wire fraud case in an attempt to circumvent the Supreme Court's decision in *Skilling v. United States*, 561 U.S. 358 (2010).

For reasons that follow, we hold the Government presented evidence sufficient to prove Defendants violated the wire fraud statute by depriving the Port Authority of, at a minimum, its money in the form of public employee labor.

**1.**

Defendants principally argue they could not have committed fraud because Baroni possessed the unilateral authority to control traffic patterns at Port Authority facilities and to marshal the resources necessary to implement his decisions.

17

They previously raised this argument in moving both to dismiss the indictment and for judgments of acquittal or a new trial. Before trial, the District Judge declined to dismiss the wire fraud counts on this basis, holding the existence and scope of Baroni's authority was a question of fact for the jury. After trial, the judge denied Defendants' motions because that question was "one that the jurors resolved in favor of the prosecution." J.A. 60. Carefully reviewing the relevant witness testimony, the judge held "the Government presented evidence at trial from which the jury could reasonably have found that Baroni did not have the authority to change the lane configurations, and in fact, did defraud the Port Authority." J.A. 59. We agree.

Defendants rely on our opinion in *United States v. Zauber*, 857 F.2d 137 (3d Cir. 1988). There, the defendants were pension fund trustees who received kickbacks for investing in a mortgage company. *See id.* at 140–41. We held the indictment failed to charge violations of the mail and wire fraud statutes because it did not allege "an actual money or property loss to the pension fund." *Id.* at 147–48. In so holding, we observed, among other things, that the defendants, "as trustees of the pension fund, had the power and the authority to invest the fund's monies with others." *Id.* at 147. Likening Baroni to the pension fund trustees in *Zauber*, Defendants argue "the undisputed evidence showed that Baroni's position as co-head of the Port Authority gave him authority to make unilateral decisions about the alignment of traffic patterns at Port Authority facilities, and to command the resources needed to carry those decisions out." Baroni Br. at 42. We disagree.

18

As a preliminary matter, *Zauber* is inapposite because here the grand jury alleged, and the Government proved at trial, that the Port Authority was actually deprived of its money and property. In any event, the evidence refutes the notion Baroni possessed "unilateral" authority to realign the bridge's lanes. To the contrary, it reveals Defendants would not have been able to realign the lanes had Baroni and Wildstein provided the actual reason or no reason at all. They had to create the traffic study cover story in order to get Port Authority employees to implement the realignment. And, as we described above, Wildstein lied to Port Authority officials Durando and Fulton about whether Executive Director Foye knew of the realignment. This lie was necessary to keep Foye in the dark and prevent him from putting an immediate end to the scheme. In fact, that is exactly what happened when he finally learned of the realignment. Foye ordered the three Special Access Lanes be restored to the use of Fort Lee motorists and refused Baroni's repeated entreaties to reinstate the realignment. Baroni then appealed to Chairman Samson, who declined to intervene and overrule Foye's decision. This evidence belies Defendants' assertion Baroni had anything approaching "authority to make unilateral decisions about the alignment of traffic patterns at Port Authority facilities." Baroni Br. at 42. If that were so, Baroni could have reinstated the realignment on his own without needing to appeal to Foye and then Samson. That Baroni was countermanded shows he lacked the unencumbered authority he claims he possessed, and that he needed to lie to realign the traffic patterns. The record contains overwhelming evidence from which a rational juror could have reached these conclusions. Indeed, it is difficult to see how any rational juror could have concluded otherwise. The jury's verdict necessarily reflects its rejection of Defendants'

19

argument that Baroni possessed unilateral authority to control the bridge.

Defendants contend we cannot draw this inference because the trial judge declined to give a jury instruction based on *Zauber*.[5] We disagree. The judge instructed the jury that

---

[5] Defendants requested the following language be added to the jury instructions:

> However, if an organization grants or bestows upon an employee the power or authority to control the organization's money or property, and the employee acts within the bounds of that power or authority, then you cannot find a scheme to defraud. Thus, if you find the Port Authority granted or bestowed upon David Wildstein or Mr. Baroni the power or authority to control the Port Authority money or property at issue here, and David Wildstein or Mr. Baroni acted within the bounds of that power or authority, then you cannot find a scheme to defraud existed. . . . Mr. Baroni and Ms. Kelly contend that the proof establishes that the Port Authority granted David Wildstein and Mr. Baroni the right to control the Port Authority money and property at issue here, which would prevent the existence of a scheme to defraud.

J.A. 307 (footnote omitted). The District Judge declined to adopt this language but told Defendants they were free to make this argument to the jury. While the Government

20

[i]n order to establish a scheme to defraud, the Government must also prove that the alleged scheme contemplated depriving the Port Authority of money and property. An organization is deprived of money or property when the organization is deprived of the right to control that money or property. And one way the organization is deprived of the right to control that money and property is when the organization receives false or fraudulent statements that affect its ability to make discretionary economic decisions about what to do with that money or property.

J.A. 5121–22. This instruction forecloses the possibility the jury convicted Defendants of fraud without finding Baroni lacked authority to realign the lanes. For Baroni could not deprive the Port Authority of money and property he was authorized to use for any purpose. Nor could he deprive the Port Authority of its right to control its money or property if that right to control were committed to his unilateral discretion. In finding the existence of a scheme to defraud, the jury necessarily concluded Baroni lacked authority to order the realignment.

**2.**

Defendants also argue the Port Authority was not deprived of any tangible property and challenge the

argued the realignment was unauthorized, Baroni instead chose to argue he acted in good faith and did not know the study was a sham.

Government's and District Court's invocation of the "right to control" theory of property.

Before trial, the trial judge rejected Defendants' related argument the charges should be dismissed because they did not "obtain" money or property. Relying on our decision in *United States v. Al Hedaithy*, 392 F.3d 580 (3d Cir. 2004), the judge ruled "it [wa]s enough that they prevented the Port Authority from exercising 'its right to exclusive use of' its property, which here allegedly includes toll booths and roadways, in addition to money in the form of employee compensation and the costs of redoing a traffic study." J.A. 36–37.

In their post-trial motions, however, Defendants raised no sufficiency arguments respecting the property at issue. Rather, they contended only that Baroni possessed the authority to realign the lanes. We note Defendants arguably forfeited their right to raise these issues on appeal by not presenting them to the District Court.[6] But we need not decide

---

[6] Nearly all our sister circuits have held that while a general sufficiency challenge is adequate to preserve specific sufficiency arguments on appeal, a defendant who seeks a judgment of acquittal on specific grounds forfeits on appeal all other grounds not specifically raised. *See United States v. Samuels*, 874 F.3d 1032, 1036 (8th Cir. 2017); *United States v. Hosseini*, 679 F.3d 544, 550 (7th Cir. 2012); *United States v. Chong Lam*, 677 F.3d 190, 200 (4th Cir. 2012); *United States v. Cooper*, 654 F.3d 1104, 1117 (10th Cir. 2011); *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010); *United States v. Herrera*, 313 F.3d 882, 884–85 (5th Cir. 2002) (en banc); *United States v. Chance*, 306 F.3d 356, 371 (6th Cir. 2002);

that question because Defendants' arguments are unpersuasive under any standard of review.

The wire fraud statute proscribes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1343. As Defendants note, the federal fraud statutes require the defendants to scheme to defraud a victim of "property rights." *See McNally v. United States*, 483 U.S. 350, 359–60 (1987) (holding that the mail fraud statute is "limited in scope to the protection of property rights"). Those property rights, however, need not be tangible. *See Carpenter v. United States*, 484 U.S. 19, 25 (1987) ("[Confidential business information's] intangible nature does not make it any less 'property' protected by the mail and wire fraud statutes. *McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights."); *United States v. Henry*, 29 F.3d 112, 113–14 (3d Cir. 1994) ("*Carpenter* made clear, however, that although a property right is required under *McNally*, it need not be a tangible one.").

---

*United States v. Peña-Lora*, 225 F.3d 17, 26 & n.5 (1st Cir. 2000); *United States v. Spinner*, 152 F.3d 950, 955 (D.C. Cir. 1998); *United States v. Delano*, 55 F.3d 720, 726 (2d Cir. 1995); *see also* 2A Charles Alan Wright et al., Fed. Prac. & Proc. Crim. § 469 (4th ed. Apr. 2018) ("And if the defendant has asserted specific grounds in the trial court as the basis for a motion for acquittal, he or she cannot assert other grounds on appeal."). We have not squarely addressed the question and need not do so here.

Defendants argue they "did not deprive the Port Authority of any tangible property." Kelly Br. at 40. "After all," they say, "the Port Authority still owns all of the lanes and tollbooths (and always has)." *Id.* But even assuming *arguendo* Defendants are correct, the federal fraud statutes are not limited to protecting tangible property rights. "[T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right." *Henry*, 29 F.3d at 115; *see also United States v. Evans*, 844 F.2d 36, 41 (2d Cir. 1988) ("That the right at issue here has not been treated as a property right in other contexts, and that there are many basic differences between it and common-law property[,] are relevant considerations in deciding whether the right is property under the federal fraud statutes.").

The Government introduced ample evidence Defendants obtained by false or fraudulent pretenses, at a minimum, public employees' labor. Their time and wages, in which the Port Authority maintains a financial interest, is a form of intangible property. *Cf., e.g.*, *United States v. Pintar*, 630 F.2d 1270, 1282 (8th Cir. 1980) ("[T]here was evidence of concealment in connection with the diversion of employee services. Assuming proof of fraud is necessary, this suffices.").[7]

Wildstein testified that, on the Friday before the lane reductions, he called Durando, the general manager of the George Washington Bridge, and said he wanted to study traffic

---

[7] As we will explain, it is well established that public employee labor is also property for the purposes of Section 666, which proscribes, *inter alia*, fraudulently obtaining property. *See infra* III.B.1.

24

patterns and see the effect of taking two lanes away from Fort Lee. Wildstein told Durando the New Jersey side of the Port Authority wanted to be able to "make a determination down the road as to whether those [Fort Lee] lanes would stay on a permanent basis." J.A. 1685. Of course, as Wildstein admitted at trial, the traffic study rationale offered to Durando was not the real reason for the realignment.

Among other things, Durando told Wildstein he would need to have a relief toll worker on duty because all of Fort Lee's traffic would be going through one lane. Wildstein testified he "understood that the Port Authority would have to pay for an extra toll collector to be on relief duty for that first toll collector," J.A. 1686, and discussed this cost with both Defendants. According to Wildstein, both Baroni and Kelly found it humorous that the Port Authority would have to "pay a second toll collector to sit and wait in case the first toll collector had to go to the bathroom," and they had no problem with the extra cost. J.A. 1687. On Sunday, September 8, 2013, Wildstein emailed Durando to say he would "be at [the] bridge early Monday [morning] to view [the] new lane test." S.A. 49. Durando replied that he would also be present, and that he had "also brought a toll collector in on overtime to keep toll lane 24 (the extreme right hand toll lane Upper level) in the event the collector assigned to TL 24 needs a personal." S.A. 49. Wildstein forwarded the email to Baroni. On cross-examination, Baroni admitted he had received the email and did not object to bringing in overtime toll booth workers.

The Government also called Theresa Riva, a Port Authority employee who served as an Operations Planning Analyst for the George Washington Bridge during the relevant time period. In that capacity, Riva supervised time keeping for

25

operations staff and managed scheduling and coverage for toll collectors. Riva testified she learned of the lane reductions the Friday before, and Bob Durando "asked [her] to staff one additional toll collector" on the upper level toll plaza twenty-four hours a day. J.A. 2897. Because toll collectors work eight-hour shifts, this meant "three toll collectors a day to be an excess toll collector in the toll house." J.A. 2897. Riva testified all these additional toll collectors were paid an overtime rate "[b]ecause they either worked on their regular day off or in excess of eight hours, a double [shift]." J.A. 2898. Riva testified these employees would not have been paid absent the lane realignment.

In addition to the overtime toll workers, Wildstein discussed with Zipf using Port Authority professional staff to track data, which would include "numbers on how—how many cars were involved and how far back the traffic was delayed." J.A. 1688. Wildstein understood Zipf "would have to use some staff time." J.A. 1688. At trial, the staff members testified to the significant amount of time they spent performing unnecessary work related to the realignment.

Amy Hwang, Senior Operations Planning Analyst for the Port Authority, testified she collected data on traffic at the bridge and compared it to traffic on the same date the year before. Hwang testified she spent two hours working on the traffic study per day from Monday, September 9, through Friday, September 13, for a total of 10 hours.

Victor Chung, Senior Transportation Planner for the Port Authority, was asked to forecast the impact of reducing Fort Lee's Special Access Lanes from three to one. Chung testified he spent a little over eight hours doing this analysis on

26

the Friday before the reductions went into effect. During the week of the reductions, Chung was asked to compare travel times approaching the bridge's upper-level toll plaza during peak hours and to compare it to historical travel times. Chung testified he spent about six hours on this analysis, for a total of 14 hours spent on unnecessary work.

And Umang Patel, Staff Service Engineer in the Port Authority's Traffic Engineering department, downloaded and analyzed data relating to travel time on the Main Line during the lane reductions. Patel testified he spent two hours discussing the lane reductions on Monday, September 9, and four hours per day analyzing data on Tuesday, September 10, through Thursday, September 12, for a total of fourteen hours.

Moreover, Wildstein estimated he spent twenty-five to thirty hours working on the lane reductions, and that Baroni spent fifteen to twenty hours, for a total of forty to fifty hours. Their compensation is plainly "money" for the purposes of the wire fraud statute.[8]

The Government's evidence that Defendants fraudulently conscripted fourteen Port Authority employees into their service, and that Baroni and Wildstein accepted compensation for time spent conspiring to defraud the Port Authority, is alone sufficient for a rational juror to have

---

[8] As we will explain, Section 666 contains a safe harbor for, among other things, bona fide compensation. *See* 18 U.S.C. § 666(c). That safe harbor applies only to that statute and does not affect our analysis of the money and property at the heart of the wire fraud counts.

concluded Defendants deprived the Port Authority of its money or property.

Although we need not reach or decide Defendant's arguments on the "right to control" theory[9] in light of our holding, we recognize this traditional concept of property provides an alternative basis upon which to conclude Defendants defrauded the Port Authority. As Baroni notes,

---

[9] Although each Defendant has fully adopted the arguments made in the other's brief, *see* Baroni Br. at 2 n.1; Kelly Br. at 4 n.1; Fed. R. App. P. 28(i), their positions on the "right to control" theory of property are in conflict. Baroni appears to accept as a background principle of law our precedent that "[i]ncluded within the meaning of money or property is the victim's 'right to control' that money or property." Baroni Br. at 41 (citing *Al Hedaithy*, 392 F.3d at 601–03). Kelly, on the other hand, argues at considerable length that "the theory that the Port Authority had been deprived of its supposed *intangible* property right to 'control' the use of its own 'assets' . . . fails as a matter of law." Kelly Br. at 40; *see id.* at 41 ("The Government has tried to sell this 'right to control' theory before, under far more egregious circumstances, but this Court did not buy it even there."); *id.* at 42 ("In any event, whatever force the 'right to control' concept may have in the private sector, it cannot be imported to condemn a state official who makes regulatory decisions."); *id.* at 45 ("The Government and the District Court invoked [*Al Hedaithy*] to support the 'right to control' theory. . . . It is utterly inapposite here."); *id.* at 46 ("In fact, the 'right to control' theory is hotly contested among the Courts of Appeals.").

"[i]ncluded within the meaning of money or property is the victim's 'right to control' that money or property."  Baroni Br. at 41 (citing *Al Hedaithy*, 392 F.3d at 601–03); *see Carpenter*, 484 U.S. at 26–27 (holding "[t]he [Wall Street] Journal had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of the 'Heard' column" and that "it is sufficient that the Journal has been deprived of *its right to exclusive use* of the information, for exclusivity is an important aspect of confidential business information *and most private property for that matter*" (emphasis added)); *Al Hedaithy*, 392 F.3d at 603 ("[T]he deprivation in this case is identical to that asserted in *Carpenter*, *i.e.*, the deprivation of ETS's right to *exclusive* use of its property."); 2 William Blackstone, *Commentaries* \*2 (describing "the right of property" as "that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe").

The George Washington Bridge is the world's busiest motor vehicle bridge[10]  leading to our nation's most populous city.  The Port Authority's physical property—the bridge's lanes and toll booths—are revenue-generating assets.  The Port Authority has an unquestionable property interest in the bridge's exclusive operation, including the allocation of traffic through its lanes and of the public employee resources

---

[10] *See George Washington Bridge*, Port Auth. of N.Y. & N.J., http://www.panynj.gov/bridges-tunnels/george-washington-bridge.html ("The busiest bridge in the world, connecting northern Manhattan and Fort Lee, NJ.") (last visited Nov. 8, 2018).

necessary to keep vehicles moving. Defendants invented a sham traffic study to usurp that exclusive interest, reallocating the flow of traffic and commandeering public employee time in a manner that made no economic or practical sense. Indeed, the realignment—intended to limit access to the bridge and gridlock an entire town—was impractical by design.

In sum, Defendants' arguments concerning the property interest at issue fall far short.

**3.**

Finally, Defendants argue we "should reject the government's attempt to shoehorn a repudiated theory of honest services fraud into an ill-fitting theory of money or property fraud." Baroni Br. at 44.

In denying Defendants' post-trial motions, the District Court summarily rejected this argument, holding "[t]here is a difference . . . between intangible rights to honest services not covered by the wire fraud statute, and intangible property rights which are." J.A. 60 n.15 (citing *Carpenter*, 484 U.S. at 25, and *McNally*, 483 U.S. at 356). We agree.

Defendants primarily rely on the Supreme Court's decision in *Skilling v. United States*, 561 U.S. 358 (2010), which narrowed the scope of the honest services statute, 18 U.S.C. § 1346. After the Supreme Court ruled in *McNally* that the mail fraud statute was "limited in scope to the protection of property rights," *Skilling*, 561 U.S. at 402 (quoting *McNally*, 483 U.S. at 360), Congress enacted Section 1346 "specifically to cover one of the 'intangible rights' that lower courts had protected . . . prior to *McNally*: 'the intangible right of honest

30

services,'" *id.* (quoting *Cleveland v. United States*, 531 U.S. 12, 19–20 (2000)). That statute provides, for the purposes of the mail and wire fraud statutes, that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." *Id.* (quoting 18 U.S.C. § 1346). In *Skilling*, the Supreme Court acknowledged "Congress intended § 1346 to refer to and incorporate the honest-services doctrine recognized in Courts of Appeals' decisions before *McNally* derailed the intangible-rights theory of fraud." *Id.* at 404. But it also recognized a broad reading of the statute "would raise the due process concerns underlying the vagueness doctrine." *Id.* at 408. In order to preserve the statute, the Court surveyed pre-*McNally* honest services case law, *see id.* 404–08, and concluded "there is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks," *id.* at 408. Accordingly, the Court limited the application of Section 1346 to "the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 409.

Defendants argue it cannot be a crime "for a public official to take official action based on concealed 'political interests.'" Baroni Br. at 48. And they warn that "[t]he government's theory—that acting with a concealed political interest nonetheless becomes mail or wire fraud so long as the public official uses *any* government resources to make or effectuate the decision—would render the Supreme Court's carefully considered limitation [on honest services fraud] a nullity." Baroni Br. at 48. According to Defendants, "[i]t cannot be the case that the Supreme Court has pointedly and repeatedly rebuffed the government's attempts to prosecute public officials for the deprivation of the public's intangible right to honest services or honest government if, all along, the inevitable use of at least a peppercorn of public money or

property made every instance of such conduct prosecutable as money or property fraud."[11] Baroni Br. at 48–49.

We are mindful of the Supreme Court's honest services case law but do not believe it counsels a different result in this case. Defendants were charged with simple money and property fraud under Section 1343—not honest services fraud—and the grand jury alleged an actual money and property loss to the Port Authority. In any event, their conduct in this case can hardly be characterized as "official action" that was merely influenced by political considerations. Defendants invented a cover story about a traffic study for the sole purpose of reducing Fort Lee's access to the George Washington Bridge and creating gridlock in the Borough. Trial testimony established that everything about the way this "study" was executed contravened established Port Authority protocol and procedures. Indeed, witnesses testified that traffic studies are

---

[11] In passing, Defendants also contend their convictions raise First Amendment concerns because they represent "a criminal penalty for misleading political speech." Baroni Br. at 49 (quoting *United States v. Blagojevich*, 794 F.3d 729, 736 (7th Cir. 2015)); *see also* Kelly Br. at 44 ("Moreover, given its implications for core political speech, this theory raises real First Amendment issues."). These arguments—to which Defendants devote a mere three sentences between their two briefs—have not been sufficiently presented or developed. We agree with the Government they are waived. *See John Wyeth & Bro. Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").

usually conducted by computer modeling, without the need to realign traffic patterns or disrupt actual traffic. When traffic disruptions are anticipated, the Port Authority gives advance public notice. And, as we have discussed, the evidence conclusively demonstrates Baroni lacked the authority to realign the bridge's traffic patterns unilaterally.

It is hard to see, under Defendants' theory, how a public official could ever be charged with simple mail or wire fraud. They appear to suggest that, as public officials, any fraud case against them necessarily entails intangible right to honest services. That is not so. As we have explained, Defendants were charged with defrauding the Port Authority of its money and property[12]—not the intangible right to their honest services. Prosecutions of public officials for defrauding the government of money and property are unfortunately quite common. *See, e.g.*, *United States v. James*, 888 F.3d 42 (3d Cir. 2018) (former Virgin Islands senator charged with wire fraud and Section 666(a)(1)(A) violations for obtaining

---

[12] The trial evidence is sufficient to show Defendants deprived the Port Authority of much more than a "peppercorn of public money or property," Baroni Br. at 49. In any event, as the Government notes, the wire fraud statute contains no monetary threshold. *See* 18 U.S.C. § 1343; *cf. United States v. DeFries*, 43 F.3d 707, 709 (D.C. Cir. 1995) ("It is difficult to see where the defendants find this *de minimis* exception. The [federal] fraud statute speaks only of 'money or property' generally, not of property above a certain value. . . . Given the absence of any statutory hint of a threshold minimum, it is hardly surprising that several courts have found [the statute] applicable to what at first glance appear to be exceedingly small property interests.").

legislature funds under false pretenses); *United States v. Fumo*, 655 F.3d 288 (3d Cir. 2011) (Pennsylvania state senator convicted of mail and wire fraud for using state-paid employees for personal and political tasks in violation of state ethics laws); *United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011) (New Jersey state senator charged with mail fraud for fraudulently inflating pension eligibility through no-show jobs); *United States v. Williams*, No. 17-137, 2017 WL 2716698 (E.D. Pa. June 6, 2017) (Philadelphia district attorney charged with mail and wire fraud for defrauding city and federal government of use of publicly owned vehicles).

Defendants also argue their convictions pose federalism concerns and would "involve[] the Federal Government in setting standards of good government for local and state officials." Baroni Br. at 49 (quoting *McNally*, 483 U.S. at 360). Again, we disagree. This case lacks the federalism concerns present in *McNally*, where the federal government prosecuted a Kentucky state official and a private citizen for their role in a "self-dealing patronage scheme" involving the state's purchase of insurance policies. *See* 483 U.S. at 352–53. But unlike a typical state or local governmental body, the Port Authority is an interstate agency created by Congressional consent, *see* H.R.J. Res. 337, 67th Cong. (1922) (enacted), and Defendants acknowledge it receives substantial federal funding. The federal government thus has an especially significant interest in protecting the Port Authority's financial and operational integrity.

\*　\*　\*

In sum, the Government presented sufficient evidence for the jury to convict Defendants of wire fraud.

**B.**

Defendants' other sufficiency challenge contests their Section 666 convictions. In relevant part, Section 666 provides:

> **(a)** Whoever, if the circumstance described in subsection (b) of this section exists—
>> **(1)** being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
>>> **(A)** embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—
>>>> **(i)** is valued at $5,000 or more, and
>>>> **(ii)** is owned by, or is under the care, custody, or control of such organization, government, or agency; . . .

> shall be fined under this title, imprisoned not more than 10 years, or both.

**(b)** The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666(a)(1)(A), (b).

Accordingly, a violation of Section 666(a)(1)(A) requires proof of five elements. The government must prove that: (1) a defendant was an agent of an organization, government, or agency; (2) in a one-year period that organization, government, or agency received federal benefits in excess of $10,000; (3) a defendant stole, embezzled, obtained by fraud, knowingly converted, or intentionally misapplied property; (4) that property was owned by, or in the care, custody, or control of, the organization, government, or entity; and (5) the value of that property was at least $5,000.[13] *See id.*

---

[13] In this case, with the parties' agreement, the trial court instructed the jury on these five elements consistent with the Third Circuit Model Jury Instruction:

> In order to find the defendants guilty of violating Section 666(a)(1)(A), you must find that the Government proved each of the following five elements beyond a reasonable doubt. First, that from August through December, 2013, Mr. Baroni or Mr. Wildstein was an agent of the Port

Defendants' appeal involves only the third and fifth elements[14]—whether they obtained by fraud, knowingly converted, or intentionally misapplied Port Authority property (the actus reus), and whether that property was worth at least $5,000.

As with the wire fraud counts, the Government's theory at trial was that the property at issue fell into two categories: physical property (i.e., the Special Access Lanes and toll booths) and money (i.e., employee labor).

---

Authority. Second, that in the calendar year 2013, the Port Authority received federal benefits in excess of $10,000. Third, that the defendants obtained by fraud, knowingly converted, or intentionally misapplied Port Authority property. Fourth, that the property obtained by fraud, knowingly converted, or intentionally misapplied, was owned by or was in the care, custody or control of the Port Authority. And fifth, that the value of the property obtained by fraud, knowingly converted, or intentionally misapplied was at least $5,000.

J.A. 5107.

[14] Defendants conceded that Baroni and Wildstein were agents of the Port Authority and stipulated that the Port Authority received federal funds in excess of $10,000 in 2013.

Defendants argue the evidence was insufficient to prove a violation of Section 666 because (1) that provision criminalizes theft, not the allocation of a public resource based on political considerations, and (2) the value of the property at issue was under $5,000.

For reasons that follow, we hold the Government presented evidence sufficient to prove Defendants violated Section 666 by fraudulently obtaining, at a minimum, the labor of Port Authority employees in furtherance of their scheme, and that the value of that labor exceeded the statute's $5,000 threshold.

**1.**

Defendants broadly argue they merely allocated a public resource based on political considerations, which cannot be criminal. Offering an analogy, Kelly contends Defendants' conduct is "materially indistinguishable" from that of a mayor who, after a heavy snowfall, directs city employees to plow the streets of a ward that supported her before getting to a ward that supported her opponent. Kelly Br. at 1. Baroni makes similar arguments. *See* Baroni Br. at 31 ("In any event, it is obvious that there is nothing illegal about allocating public resources to favor political supporters and allies. Budgets are enacted, projects are funded, pork is doled out, potholes are filled, and snow is plowed at every level of government with political considerations in mind.").

While such analogies have some superficial appeal, we find them unpersuasive. We agree with the District Court that this argument "conflates motive . . . with *mens reas* and conduct." J.A. 54. Defendants altered the bridge's decades-

38

old lane alignment—without authorization and in direct contravention of Port Authority protocol—for the sole purpose of creating gridlock in Fort Lee. To execute their scheme, they conscripted fourteen Port Authority employees to do sham work in pursuit of no legitimate Port Authority aim. That Defendants were politically motivated does not remove their intentional conduct from the ambit of the federal criminal law. What Defendants did here is hardly analogous to a situation where a mayor allows political considerations to influence her discretionary allocation of limited government resources in the normal course of municipal operations. There is no facially legitimate justification for Defendants' conduct here.

Nor are we persuaded by Defendants' arguments that the Government has sought to expand the reach of Section 666 beyond conduct involving bribery and theft. Relying upon our decision in *United States v. Cicco*, 938 F.2d 441 (3d Cir. 1991), Defendants contend the Government is attempting to use Section 666 "to criminalize a public official's efforts to allocate or reallocate public resources based on politics." Baroni Br. at 24. In that case, Cicco, a mayor, declined to rehire two auxiliary police officers because they failed to support the Democratic Party in a local election. *See Cicco*, 938 F.2d at 443. The Government filed a multi-count indictment charging Cicco and a member of the town council with, among other things, violations of Section 666's anti-bribery provision, 18 U.S.C. § 666(a)(1)(B). *See id.* After the jury found the defendants guilty, the trial court entered a judgment of acquittal on the Section 666 counts, reasoning Congress did not intend for the statute to apply to their conduct and that it was unconstitutionally vague. *See id.* at 444.

On appeal, we recognized Section 666, read literally, might cover the defendants' use of municipal employment to solicit election day services as a form of quid pro quo, but that the statute's language was "also consistent with an intention of focusing solely on offenses involving theft or bribery, the crimes identified in the title of that section." *Id.* at 444. Because we found the statute ambiguous, we turned to the legislative history. Concluding "the crimes Congress targeted when it created § 666 are simply different in kind than those alleged" against the defendants, we held they did not violate the statute. *Id.* at 445–46. We also observed that the conduct in question—deprivation of public employment to solicit political contributions—was within the ambit of a different criminal statute, 18 U.S.C. § 601. *See id.* at 446.

The Government responds that *Cicco* is inapposite because the conduct at issue in that case "potentially implicated the bribery provisions of § 666(a)(1)(B), but has nothing to do with property obtained by fraud, converted or otherwise intentionally misapplied." Gov't Br. at 38. We agree that this case is not like *Cicco*.

But *Cicco* is instructive here. Our exposition of Section 666's legislative history—which was not limited to Section 666's bribery provisions—confirms that Defendants' conduct in this case falls squarely within the statute's purpose. As we explained in *Cicco*, Congress enacted Section 666 as part of the Comprehensive Crime Bill of 1984. *See* 938 F.2d at 444. We noted "[t]he provision was 'designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies which are disbursed to private organizations or State and local governments pursuant to a Federal program.'" *Id.*

40

(quoting S. Rep. No. 98-225, at 369 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3510).  We observed "[t]he Senate Report expressly notes that Congress wished the new statutory provision to be interpreted 'consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery.'"  *Id.* at 444 (quoting S. Rep. No. 98-225, at 370, 1984 U.S.C.C.A.N. at 3511).  And "[w]e quote[d] extensively from the legislative history to illustrate that Congress intended § 666 to redress particular deficiencies in identified existing statutes."[15] *Id.* at 444–45.

---

[15] The legislative history reveals Congress intended for Section 666 to augment two existing statutes, 18 U.S.C. §§ 641 and 665.  Section 641, "the general theft of Federal property statute," applies "only if it can be shown that the property stolen is property of the United States." *Cicco*, 938 F.2d at 445 (quoting S. Rep. No. 98-225, at 370, 1984 U.S.C.C.A.N. at 3511).  As we recounted, the Senate Report explains:

> In many cases, such prosecution is impossible because title has passed to the recipient before the property is stolen, or the funds are so commingled that the Federal character of the funds cannot be shown.  This situation gives rise to a serious gap in the law, since even though title to the monies may have passed, the Federal Government clearly retains a strong interest in assuring the integrity of such program funds.

*Id.* (quoting S. Rep. No. 98-225, at 370, 1984 U.S.C.C.A.N. at 3511).  And while Section 665 makes it a crime for an

41

We have subsequently reaffirmed our understanding that Congress intended Section 666 to focus on offenses involving fraud and theft, observing "that Congress intended to expand the federal government's prosecutorial power to encompass significant misapplication of federal funds at a local level." *United States v. Willis*, 844 F.3d 165, 165 (3d Cir. 2016) (quoting *United States v. Valentine*, 63 F.3d 459, 463 (6th Cir. 1995)). We have also "not[ed] that courts have been wary of interpreting § 666 too narrowly" and that "the Supreme Court has repeatedly avoided constructions of § 666 that would impose limits beyond those set out in the plain meaning of the statute." *Id.* at 166. Although all of the relevant Supreme Court cases involve challenges to Section 666's bribery provisions, their discussion of the statute's text and legislative history validate our long-established understanding of the statute's purpose and scope.

In *Salinas v. United States*, 522 U.S. 52 (1997), for example, the petitioner contended the Government must prove a connection between a bribe and federal funds to obtain a conviction under Section 666(a)(1)(B). *Id.* at 55–56. The Supreme Court disagreed, holding that Section 666's bribery prohibition "is not confined to a business or transaction which

agency officer or employee to steal federal job training funds, there was no statute of general applicability pertaining to theft or embezzlement by such individuals. *See id.* Thus Congress enacted Section 666, in part, to correct the deficiencies in these provisions. "The goal was to protect federal funds by authorizing federal prosecutions of thefts and embezzlement from programs receiving substantial federal support even if the property involved no longer belonged to the federal government." *Id.*

42

affects federal funds." *Id.* at 57. Relying upon the statute's "expansive, unqualified language, both as to the bribes forbidden and the entities covered," *id.* at 56, and "the broad definition of the 'circumstances' to which the statute applies," the Court found "no textual basis for limiting the reach of the bribery prohibition," *id.* at 57. The Court held the statute was unambiguous on this point because it would "be 'plain to anyone reading the Act' that the statute encompasses the conduct at issue," *id.* at 60 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 467 (1991)).

The Court next addressed Section 666 in *Fischer v. United States*, 529 U.S. 667 (2000). At issue was whether Medicare payments paid to a hospital constituted federal "benefits" for the purposes of Section 666(b). *Id.* at 669. The petitioner argued the qualifying patient was the sole beneficiary of payments made under the Medicare program and that hospitals were merely being compensated for services rendered. *See id.* at 676. The Court disagreed, holding that a federal assistance program can have multiple beneficiaries, and that participating health care organizations were also beneficiaries under the Medicare program. *See id.* at 677–81. The Court reasoned, in part, that "[c]oupled with the broad substantive prohibitions of subsection (a), the language of subsection (b) reveals Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs." *Id.* at 678.

Finally, in *Sabri v. United States*, 541 U.S. 600 (2004), the Supreme Court addressed another challenge to Section 666's bribery provision. The petitioner argued, *inter alia*, that Section 666(a)(2) could "never be applied constitutionally because it fails to require proof of any connection between a

43

bribe or kickback and some federal money." *Id.* at 604. The Court disagreed, holding that the Necessary and Proper Clause gives Congress the power "to see to it that taxpayer dollars appropriated under [its Spending Clause] power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars." *Id.* at 605. The Court thus held "[i]t is certainly enough that the statutes condition the offense on a threshold amount of federal dollars defining the federal interest, such as that provided here." *Id.* at 606. To confirm its understanding of the statute, the Court relied upon the same legislative history we discussed extensively in *Cicco*:

> For those of us who accept help from legislative history, it is worth noting that the legislative record confirms that § 666(a)(2) is an instance of necessary and proper legislation. The design was generally to 'protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery,' see S.Rep. No. 98-225, p. 370 (1983), in contrast to prior federal law affording only two limited opportunities to prosecute such threats to the federal interest: 18 U.S.C. § 641, the federal theft statute, and § 201, the federal bribery law. Those laws had proven inadequate to the task. The [federal theft statute] went only to outright theft of unadulterated federal funds . . . .

*Id.* Recognizing that the statute was intended to address offenses involving fraud and theft, the Court held that

44

"Congress was within its prerogative to protect spending objects from the menace of local administrators on the take." *Id.* at 608.

Defendants' reliance on *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), is also misplaced. In that case, Thompson, a Wisconsin state procurement official, was prosecuted for steering a contract to a local travel agency, allegedly in violation of state procurement statutes and regulations. *See id.* at 878–80. The government's theory had been that Thompson "'intentionally misapplie[d]' more than $5,000 by diverting it" away from the firm that should have been selected under the state's procurement regulations. *Id.* at 880. The Seventh Circuit was not convinced that Thompson's decision actually violated the state's regulations. *See id.* at 880–81. And it observed that, unlike "[a]pproving a payment for goods or services not supplied," her conduct "d[id] not sound like 'misapplication' of funds." *Id.* at 881. Significantly, the firm she selected was actually the low bidder, and "[t]he federal government saved money because of Thompson's decisions." *Id.* The Seventh Circuit turned to the statute's caption—"Theft or bribery concerning programs receiving Federal funds"—because "the word 'misapplies' is not a defined term." *Id.* Relying on that caption and the Rule of Lenity, the Seventh Circuit adopted a more narrow reading of intentional misapplication "that limits § 666 to theft, extortion, bribery, and similarly corrupt acts." *Id.* The Court further commented it did not believe a state official's violation of state regulations and statutes—even if intentional—would violate Section 666 "unless the public employee is on the take." *Id.*

45

*Thompson* is distinguishable.  Thompson applied the state's procurement regulations in a way that actually saved the federal government money and caused no loss.  Defendants, on the other hand, lied in order to obtain public employee labor from fourteen Port Authority employees.  They forced the Port Authority to pay unnecessary overtime to toll workers and diverted well-paid professional staff away from legitimate Port Authority business.  Their fraud is soundly within the scope of conduct Congress sought to proscribe in Section 666.

We hold that, at a minimum, the Government offered a valid theory that Defendants fraudulently obtained, knowingly converted, or intentionally misapplied the labor of Port Authority employees, and that it offered evidence sufficient to sustain Defendants' convictions.

It is well established that public employees' labor is property for the purposes of Section 666.  *See, e.g.*, *United States v. Sanderson*, 966 F.2d 184, 189 (6th Cir. 1992) (concluding the defendant's "theft of employee time [wa]s as much a theft of property as his theft of  [physical property], for the purposes of his section 666(a)(1)(A) conviction"); *accord United States v. Genova*, 333 F.3d 750, 758–59 (7th Cir. 2003) (affirming conviction under Section 666(a)(1)(A) where the defendant used public works employees for political labor); *United States v. Delano*, 55 F.3d 720, 729 (2d Cir. 1995) (holding indictment sufficiently detailed instance of theft of "the labor of [the defendant's] employees").

We have explained, in addressing Defendants' sufficiency challenge to the wire fraud counts, how they defrauded the Port Authority of the labor of fourteen public employees—eleven toll collectors paid overtime and three

46

professional staff members—in furtherance of the scheme. Those public employees spent hours doing work that was unnecessary and furthered no legitimate Port Authority aim. Defendants were able to obtain these employees' labor only by lying about the purpose of the realignment, claiming they were conducting a traffic study.

Defendants argue they could not have misapplied Port Authority employee labor because they did not receive a "personal pecuniary benefit." Baroni Br. at 27. We disagree. Defendants had Port Authority employees do work they would not have otherwise done to further their personal scheme. The fact Defendants sought to benefit politically, not monetarily, does not alter the fact they forced the Port Authority to pay toll workers overtime, and diverted the time of salaried professional staff, in furtherance of no legitimate purpose. *Cf. Genova*, 333 F.3d 758–59 (explaining that "the point of the § 666 prosecution is that political activities are *not* the performance of a garbage collector's official duties," and that while "Public Works employees were entitled to unpaid leave for political endeavors[,] the § 666 problem was paying them for that time").

Defendants argue this interpretation raises constitutional vagueness concerns. We disagree. At trial, the Government introduced evidence that, after Jersey City Mayor Steven Fulop declined to endorse Governor Christie, the Governor's office directed state agencies (including the Port Authority) to cancel meetings with Fulop and otherwise ignore him. In seeking to admit this evidence, *see* Fed. R. Evid. 404(b), the Government argued there was no danger of unfair prejudice because "[t]he mistreatment of Mayor Fulop, while hardly reflective of good government, was not criminal and

47

thus, was *less* serious than the criminal conduct for which Defendants stand accused, conduct that needlessly imperiled public safety in Fort Lee and directly inconvenienced thousands of people." J.A. 259–60. Defendants contend it is not clear why their mistreatment of Mayor Sokolich is criminal, but their mistreatment of Mayor Fulop was not, and that "[t]his inconsistency demonstrates the inherent arbitrariness of the government's interpretation of Section 666." Baroni Br. at 40. Defendants again conflate motive with conduct. While their decision to punish Mayor Fulop may have been animated by the same desire to exact political revenge, there were no allegations they defrauded their federally funded employer in order to do so.

Defendants also raise federalism concerns, arguing the Government is improperly attempting "to police state and local officials in the conduct of their official duties." Baroni Br. at 36. As we have observed, Congress has a uniquely significant interest in safeguarding the Port Authority, an interstate agency created by its consent. But we also believe federalism arguments are especially inapposite in the context of Section 666. We have described how Congress enacted Section 666 specifically to bring state and local officials within the scope of the federal criminal theft law. And as the Supreme Court has observed, "Congress was within its prerogative to protect spending objects from the menace of local administrators." *Sabri*, 541 U.S. at 608.

In sum, the Government presented evidence sufficient to prove Defendants fraudulently obtained, knowingly converted, or intentionally misapplied Port Authority employee labor in violation of Section 666(a)(1)(A).

48

**2.**

Finally, Defendants contend there was insufficient evidence to meet the $5,000 threshold because the Port Authority employees' wages are exempt under 18 U.S.C. § 666(c)'s safe harbor for bona fide compensation, and the Government quantified only $3,696 in toll workers' wages. They also assert the costs the Port Authority incurred in redoing the legitimate Center and Lemoine traffic study cannot satisfy the $5,000 threshold because they were not aware of the study and the costs represent consequential damages, not the value of misapplied property.[16]

The District Judge rejected these arguments, concluding "the Government introduced evidence that Defendants

---

[16] We note the jury was also instructed it could consider "the value of the affected real property, including the lanes and toll booths as measured by the amount of tolls generated during the lane and toll booth reductions." J.A. 5110–11. In summation, the Government directed the jury to evidence demonstrating that the sole remaining Special Access Lane collected "well in excess of $5,000" during the week of the realignment. J.A. 5297. Defendants did not challenge the sufficiency of this evidence in their post-trial motions and do not raise the issue on appeal. And they concede "the lanes and tollbooths can qualify as 'property' for" Section 666. Kelly Br. at 40. This alone seemingly forecloses any argument the $5,000 threshold was not satisfied. But because our affirmance of Defendants' Section 666 convictions rests on their theft of employee labor, and the Government presented sufficient evidence the value of that labor exceeds $5,000, we decline to decide the issue.

diverted Port Authority personnel to do work that was not part of the agency's 'usual course of business' when reconfiguring the access lanes," and that "[t]he jury could reasonably find that the value of compensation paid to Port Authority personnel, losses from a ruined traffic study, and the value of the lanes and toll booths were not bona fide and satisfied the $5,000.00 threshold." J.A. 58.

Without reaching the other costs presented to the jury (i.e., the value of the lanes and toll booths themselves, and the costs of redoing the Center and Lemoine traffic study), we hold the Government presented sufficient evidence that Defendants fraudulently obtained more than $5,000 worth of public employee labor.

As to the cost of compensating overtime toll booth workers, the Government introduced, and Riva testified to, detailed payroll records showing eleven overtime toll booth workers were paid $3,696.09. The Government presented this number to the jury on a chart and reminded them of the specific figure in summation.

As to the value of the time of Port Authority professional staff, and of Baroni and Wildstein themselves, the Government also presented witness testimony and detailed payroll records.[17] On the first day of trial, payroll records for

---

[17] In its brief, the Government asserts it "established that the lane diversion required $5,524.93 in pro-rated salaries of [Port Authority] employees to implement, and that is before the value of time Baroni and Wildstein spent on their mission to gridlock Fort Lee and cover up the reasons for that gridlock."

50

the relevant Port Authority employees were admitted by stipulation. These records indicate an hourly rate of $43.79 for Hwang, $52.11 for Chung, $47.24 for Patel, $79.59 for Wildstein, and $153.67 for Baroni. Based on these rates and the hours Hwang, Chung, and Patel testified they worked on the sham traffic study, the evidence shows their time was valued at $437.90 ($43.79 x 10 hours), $729.54 ($52.11 x 14 hours), and $661.36 ($47.24 x 14 hours), respectively.

---

Gov't Br. at 47 (citing J.A. 650–51). In support of this figure, the Government cited its post-trial sentencing memorandum. That memorandum contains a chart quantifying, *inter alia*, the cost of labor provided by Hwang, Chung, Patel, the additional toll collectors, and Baroni and Wildstein. The source of these calculations was unclear, however, because the chart contains no citations to the trial record.

At oral argument, the Government explained the calculations were established at trial through Port Authority payroll records, which had been admitted into evidence by stipulation, and testimony from Hwang, Chung, Patel, and Wildstein about how many hours each had worked on the fraudulent traffic study.

Following oral argument, we requested the Government to file a supplemental letter brief addressing, with citations to the trial record, the evidence it presented to the jury to establish the property subject to the Section 666 counts is valued at $5,000 or more. We further ordered the Government to attach any relevant trial exhibits or stipulations it had not previously submitted. We also allowed Defendants to file a joint response. The Government timely filed its brief, and Defendants filed a joint response.

51

Cumulatively, the three Port Authority traffic engineers provided unnecessary labor valued at approximately $1,828.80. The value of the work done by Hwang, Chung, and Patel, taken with the $3,696.09 spent on overtime toll workers, satisfies the $5,000 threshold.

Furthermore, based on Wildstein's testimony about the amount of time he and Baroni spent in furtherance of the scheme, the value of their time was, at a minimum, $4,294.80. This figure reflects approximately $1,989.75 for Wildstein's time ($79.59 x 25 hours) and $2,305.05 for Baroni's time ($153.67 x 15 hours).

The Government reminded the jury of this evidence in summation:

> Based on Port Authority payroll records and testimony you've heard, about $5,000 in Port Authority salaries were paid for the time in connection for the lane reduction work performed by Tunnels, Bridges and Terminals, Miss Hwang, Mr. Chung, traffic engineering Mr. Patel, as well as for Mr. Baroni and Mr. Wildstein's time spent to facilitate and conceal causing traffic problems in Fort Lee. Those service[s] were wasted. Those services were wasted for these lane reductions meant to punish the Mayor.

J.A. 5295–96. Accordingly, we conclude the Government presented to the jury evidence sufficient to satisfy the $5,000 threshold.

52

Defendants argue this compensation cannot count toward the threshold under the statute's exemption for "bona fide salary, wages, fees, or other compensation." 18 U.S.C. § 666(c). According to Defendants, "all of the Port Authority staff responsibly performed actual work, in good faith, for facially legitimate Port Authority purposes." Kelly Br. at 38. The Government responds this argument is "a red herring" because "Defendants fraudulently obtained and misapplied the *services* of [Port Authority] staff, not those employees' *salaries*."[18] Gov't Br. at 45. "But the best way of measuring

---

[18] The Government made this distinction at trial. In its summation, the Government argued:

> The defendants also agreed to misuse the time and the services of Port Authority employees. Those services have value. They're worth money. And that's Port Authority money. The Port Authority money that was paid to those employees. And because the Port Authority paid the salaries of each of the employees who wasted their time in furtherance of the defendants' scheme to punish the Mayor. And that includes the salary paid to the overtime toll booth collectors for the one remaining toll booth that was accessible to Fort Lee. That also includes the money paid to Baroni and Wildstein themselves while they spent time wasting, wasting their time in furtherance of this conspiracy. When they were suppose[d] to be working to advance the Port Authority's interests. And it includes money paid to the

the value of those services," according to the Government, "was to calculate what portion of those employees' salaries covered the time they spent unwittingly carrying out Defendants' vendetta." *Id.* We agree.

Section 666(c) has no application to the services of the eleven overtime toll booth workers, Hwang, Chung, or Patel. The Government offered evidence Defendants fraudulently obtained those public workers' services and labor; their salaries are merely a measure of the loss incurred by the Port Authority when it compensated those individuals for unnecessary, sham work. *See United States v. Valentine*, 63 F.3d 459, 465 (6th Cir. 1995) (holding "the plain language of [Section 666(c)] does not preclude prosecution" where there is "no allegation concerning [the defendant's] own salary, nor the salary of others," and "the government presented proof that [the defendant] misappropriated employee services").

The charges involving the compensation paid to Baroni and Wildstein themselves are different, however. The accusation is essentially that they did not earn their salaries in good faith by accepting payment for time spent defrauding their employer, so their compensation for that time could not have been "bona fide." Section 666(c) thus could apply to exempt compensation paid to Baroni and Wildstein. "Whether

---

engineers who wasted time—and Port Authority professional staff, who wasted time collecting data that no one ever wanted.

J.A. 5194.

54

wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide." *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007); *accord United States v. George*, 841 F.3d 55, 62–63 (1st Cir. 2016).

In this case, the judge instructed the jury that "[p]roperty does not include bona fide salary, wages, fees or other compensation paid or expenses paid or reimbursed in the ordinary course of business," and that "[c]ompensation for an employee's time and services obtained through deception is not legitimate or bona fide." J.A. 5110. This instruction allowed the jury properly to exclude Baroni and Wildstein's compensation under Section 666(c) only if it found they were both bona fide and paid in the usual course of business.

Because the jury in this case was provided only a general verdict form, we do not know how it determined the $5,000 threshold was satisfied. The wire fraud convictions suggest the jury did not find Baroni and Wildstein's compensation "bona fide." *See* Black's Law Dictionary 210 (10th ed. 2014) (defining "bona fide" as "in good faith; without fraud or deceit"). But even if the jury determined Baroni and Wildstein's compensation was subject to the Section 666(c)'s safe harbor, the value of the services of the eleven toll workers and of Hwang, Chung, and Patel—which was not subject to that exemption—was sufficient to satisfy the statute's $5,000 threshold.

In light of our holding, we need not address Defendants' argument the frustrated Center and Lemoine traffic study is not cognizable property under Section 666.

\* \* \*

55

Because the Government offered evidence at trial sufficient to prove Defendants fraudulently obtained the labor of Port Authority employees, and that the value of that labor exceeded $5,000, Defendants' sufficiency challenge must fail.

**IV.**

Defendants also challenge the jury instructions on the Section 666 counts and the District Judge's refusal to instruct the jury it was required to find Defendants intended to punish Mayor Sokolich.

Where, as here, a party has timely objected to the trial court's jury instructions, we exercise plenary review in determining whether the jury instructions stated the proper legal standard. *See United States v. Shaw*, 891 F.3d 441, 449–50 (3d Cir. 2018). "We must 'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error'" for the error to be harmless. *United States v. Elonis*, 841 F.3d 589, 597–98 (3d Cir. 2016) (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)). Our inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

**A.**

Defendants raise three challenges to the jury instructions on the Section 666 counts. They argue we should vacate and remand their convictions because the District Judge erred in instructing the jury: (1) to consider the value of the Center and Lemoine study in determining whether the $5,000

56

threshold was satisfied; (2) that the Government did not need to prove Defendants knew of the specific property fraudulently obtained, knowingly converted, or intentionally misapplied; and (3) that "[t]o intentionally misapply money or property" means to intentionally use money or property "knowing that the use is unauthorized or unjustifiable or wrongful," J.A. 5109. Because any error was harmless beyond a reasonable doubt, we will affirm.

## 1.

Defendants contend that, even if there is evidence sufficient to prove Section 666 violations, we should vacate their convictions and remand for retrial because the District Judge erroneously instructed the jury to consider the value of the Center and Lemoine traffic study. Because we can affirm Defendants' convictions solely on the value of public employee labor, we need not reach the Center and Lemoine study.

We have already detailed the trial evidence establishing the value of the public employees' labor in addressing Defendants' sufficiency challenge. Our analysis there focused on whether the record, viewed in the light most favorable to the Government, provided a sufficient basis for a rational juror to convict. But our inquiry here is different. Defendants contend that, even if the record contained sufficient evidence that the value of public employee labor exceeded $5,000, we cannot be certain beyond a reasonable doubt the jury actually considered all of that time in light of its instructions. We disagree. No reasonable juror could have failed to credit the value of Port Authority employee labor Defendants used to effect their

fraudulent scheme, which alone satisfies Section 666(a)(1)(A)(i)'s $5,000 threshold.

Defendants do not assert any error in the jury instructions as to the value of the public employee labor, and we find none. The Government presented overwhelming and undisputed evidence—which we described in analyzing Defendants' sufficiency challenge—concerning the amount of time Port Authority employees spent in furtherance of Defendants' scheme.

As to the cost of compensating overtime tollbooth workers, the Government introduced, and Riva specifically testified to, detailed payroll records showing eleven overtime tollbooth workers were paid $3,696.09. The Government presented this number to the jury on a chart and referenced it in summation.

The Government also elicited testimony from three members of the Port Authority's professional staff—Hwang, Chung, and Patel—about the time they spent collecting traffic data on the realignment, in furtherance of no legitimate Port Authority purpose, and testimony from Wildstein about the time he and Baroni spent in furtherance of the scheme. Detailed payroll records reveal the value of the traffic engineers' time was approximately $1,828.80.

Defendants argue we cannot be confident the jury considered the traffic engineers' time because it was not presented a full calculation of the value of their hourly rate multiplied by the hours they claimed to have worked on the sham study. We disagree. The parties admitted the relevant payroll records by stipulation, the Government elicited

testimony to establish the number of hours worked, and it reminded the jury of this evidence in summation, estimating that the value of the engineers' and Baroni and Wildstein's time exceeded $5,000—which is correct. The amount was over $6,000.

Accordingly, the value of the work performed by Hwang, Chung, and Patel, taken together with the $3,696.09 spent on overtime toll workers, satisfies the $5,000 threshold. The time Baroni and Wildstein spent plotting their fraud represents an additional $4,295.

Because the jury was instructed "[c]ompensation for an employee's time and services obtained through deception is not legitimate or bona fide," and the Government presented overwhelming evidence Defendants fraudulently obtained Port Authority employee services, the jury necessarily found all the toll worker and professional staff time satisfied the $5,000 threshold and was not subject to Section 666(c)'s exclusion for bona fide compensation. As noted, even if the jury did not credit Baroni and Wildstein's compensation, the value of employee time Defendants obtained nonetheless exceeds $5,000.

Defendants' convictions on the wire fraud counts confirm this conclusion. The jury found Defendants defrauded the Port Authority and conspired to do so. The only fraudulent scheme before them was one to cause a traffic blockage in Fort Lee by conducting a sham traffic study. There is overwhelming evidence that the bridge lanes were altered, eleven toll collectors worked additional overtime hours as a result, and the traffic study was conducted with the help of several well-paid Port Authority engineers. Defendants do not

59

argue the study was not conducted. At trial, they asserted they did not know it was a sham or barely participated in it—an argument the jury roundly rejected. Indeed, the jury was instructed that, if it found the Defendants believed the traffic study was legitimate, it was a complete defense. On appeal, they argue Baroni had the authority to conduct the study even if it was a sham. The jury could not have concluded that Defendants conspired to conduct a sham traffic study but then ignored the value of the employee labor necessary to effect that fraudulent scheme. As we have explained, the jury was presented with overwhelming and undisputed evidence demonstrating the value of the toll workers' and professional staff's time exceeds $5,000.

**2.**

Next, Defendants contend the District Court erred in instructing the jury it did not need to know of the specific property obtained. Defendants raise this argument to challenge the inclusion of the Center and Lemoine study in the jury instructions. Although we agree the instruction was erroneous, the error was harmless.

The District Judge instructed the jury:

The Government does not have to prove that the Defendants knew of the specific property obtained by fraud, knowingly converted, or intentionally misapplied, or that the value of the property met or exceeded $5,000.

J.A. 5110. This addition to the Third Circuit's Model Jury Instruction was proposed by the Government. In proposed draft

60

jury instructions submitted to the trial court, the Government "propose[d] keeping [this] language" on the following basis:

> As this Court recognized in denying Defendants' motions to dismiss the Indictment, the $5,000 requirement is a "jurisdictional element." *United States v. Baroni*, Crim. No. 15-193, 2016 WL 3388302, at *7 (D.N.J. June 13, 2016) (citing *United States v. Briston*, 192 F. App'x 84, 85 (3d Cir. 2006)). The Third Circuit has long held that a defendant's "knowledge of . . . jurisdictional fact[s]" is "irrelevant." *United States v. Crutchley*, 502 F.2d 1195, 1201 (3d Cir. 1974); *see also United States v. Moyer*, 674 F.3d 192, 208 (3d Cir. 2012) ("[i]t is well settled that mens rea requirements typically do not extend to the jurisdictional elements of a crime") (quotation omitted).

J.A. 495. At the charging conference, Defendants objected to this addition and requested the judge instruct the jury it had to be "at least reasonably foreseeable what property would be obtained." J.A. 4993. The Government responded that "[r]easonably foreseeable goes to mens rea, which the Third Circuit has held clearly does not extend to the jurisdictional elements of statutes like 666." J.A. 4993. The judge agreed and declined to instruct the jury the property at issue had to be reasonably foreseeable to Defendants. J.A. 4994.

Defendants argue this was error because the "Section 666's jurisdictional element is the requirement that the victim be a federal program beneficiary," and that "[t]he $5,000 threshold is a *de minimis* exception, below which Congress

simply chose not to authorize prosecution." Baroni Br. at 73; *see Fischer*, 529 U.S. at 682 (Thomas, J., dissenting) (describing "[t]he jurisdictional provision of 18 U.S.C. § 666(b)"). We agree Section 666(b) is the statute's jurisdictional provision in the sense that this provision provides the jurisdictional hook "tying the proscribed conduct to the area of federal concern delineated by the statute," *United States v. Feola*, 420 U.S. 671, 695 (1975), here Congress's Spending Clause power, *see Sabri*, 541 U.S. at 605. But Section 666(a)(1)(A)(i)'s requirement that the value of affected property be at least $5,000 can be described as jurisdictional in the sense that it is a "jurisdictional floor" below which Congress has determined there is insufficient federal interest in prosecution.

In any event, the affected property is not part of Section 666(a)(1)(A)(i)'s $5,000 requirement. That provision requires only that the property "is valued at $5,000 or more." 18 U.S.C. § 666(a)(1)(A)(i). The property is the direct object of the conduct element, Section 666(a)(1)(A), which provides that one who "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, *property*" violates the statute. *Id.* § 666(a)(1)(A).

While the jury need not have found that Defendants knew the *value* of the property, it was error for the trial judge to instruct the jury "[t]he Government d[id] not have to prove that the Defendants knew of the specific property obtained by fraud, knowingly converted, or intentionally misapplied." J.A. 495. Such an instruction runs the risk of negating the statute's *mens rea* requirement and thus relieving the Government of its burden of proof on an essential element of the crime. We do

62

not believe, for example, one could intend to misapply something one does not know exists; to instruct the jury otherwise would seemingly dispense with the intent requirement.

But because we need not reach nor credit the Center and Lemoine study to affirm Defendants' convictions, the error was harmless. There is overwhelming evidence Defendants knew of the property fraudulently obtained or intentionally misapplied, including the work of fourteen of Baroni's subordinates at the Port Authority.

**3.**

Defendants next challenge the District Judge's definition of intentional misapplication as ambiguous. We disagree. Following the Third Circuit Model Jury Instruction, the judge instructed the jury:

> To intentionally misapply money or property means to intentionally use money or property of the Port Authority knowing that the use is unauthorized or unjustifiable or wrongful. Misapplication includes the wrongful use of the money or property for an unauthorized purpose, even if the use actually benefitted the Port Authority.

J.A. 5109. Defendants argue that "unjustifiable or wrongful" is overbroad and ambiguous. Defendants raised this same argument in pretrial motions and at the charging conference. The Government responded these are common terms and have been used in numerous intentional misapplication cases going

back decades. Kelly's lawyer suggested that the judge "just define what unjustifiable and wrongful are," but when asked for proposed definitions, had nothing to offer. J.A. 4992. The judge overruled Defendants' objection because the terms are not "inherently vague" and were not "strong legal term[s]." J.A. 4992.

On appeal, Defendants argue these terms are so broad that the jury could have convicted if it believed the lane realignment was "a bad idea," unjustifiable "as a policy matter," or that Baroni should have sought Executive Director Foye's approval. Kelly Br. at 35 (emphasis omitted). We disagree.

Other instructions in the District Judge's thorough and comprehensive charge foreclose the possibility the jury convicted defendants for lawful but imprudent conduct, e.g., because the jury thought the lane reductions were "a bad idea." These include the requirement that $5,000 worth of property be stolen or misapplied and that the misapplication be "for an unauthorized purpose." The judge also told the jury that it had to be convinced beyond a reasonable doubt that the purpose of the lane reductions was *not* a legitimate traffic study and that Defendants' good faith would be a complete defense to the charges. *See* J.A. 5141–42. Because the jury was instructed that Defendants could not be convicted if they believed in good faith that the reductions were part of a legitimate traffic study, a jury following its instructions could not have convicted Defendants based on its personal judgments about the wisdom and execution of the traffic study.

Moreover, we observe that this definition, or even broader language, is contained in the model jury instructions in

several of our sister circuits. It is included verbatim in the Section 666 pattern jury instructions from the Eighth Circuit. 8th Cir. Model. Crim. Jury Instr. § 6.18.666A. The First Circuit's 18 U.S.C. § 656 (theft, embezzlement, or misapplication by bank officer or employee) pattern instructions define "willful misapplication" to include "that [defendants] wrongfully used the bank's funds" without further clarifying what "wrongfully" means. 1st Cir. Model. Crim. Jury Instr. § 4.18.656. The Ninth and Tenth Circuits both have pattern instructions for statutes containing "willful misapplication" that do not define those terms at all. *See* 9th Cir. Model. Crim. Jury Instr. § 8.41; 10th Cir. Model Crim. Jury Instr. § 2.32. Jurors are regularly trusted to understand the meaning of these ordinary words in criminal cases.

**B.**

Defendants also challenge the District Judge's refusal to instruct the jury it needed to find Defendants intended to punish Mayor Sokolich in order to convict. They contend this error affects every count and constructively amended the indictment, "permit[ing] the jury to convict based on conduct that was not unlawful." Baroni Br. at 63. We disagree.

Defendants requested the object of the conspiracy be defined throughout the jury charge as one "to misuse Port Authority property to facilitate and conceal the causing of traffic problems in Fort Lee as punishment of Mayor Sokolich." *E.g.*, J.A. 501–04, 506. The trial court disagreed, ruling "the purpose or the object of the conspiracy being to punish Mayor Sokolich goes to motive," which is "not an element of the crime" and so "not an element that has to be proven." J.A. 5009.

65

During deliberations, the jury sent a note asking: "Can you be guilty of conspiracy without the act being intentionally punative [sic] toward Mayor Socholich [sic]." J.A. 648. The judge responded: "Yes. Please consider this along with all other instructions that have been given to you." J.A. 648.

In their post-trial motions, Defendants argued the punishment of Mayor Sokolich was "an essential element of each of the charged offenses," and that the failure to instruct the jury on this point relieved the Government of its burden of proof. J.A. 50. The trial judge again disagreed, explaining that "any punitive goal Defendants may have had goes to their motive for violating the charged statutes, [but] is not an essential element of any of the crimes charged." J.A. 50. We agree.

Defendants argue the "intent to punish Sokolich [is] an essential element of the *mens rea* of the charged offenses." Baroni Br. at 58. Once again, Defendants conflate motive with *mens rea* intent and conduct. As we recently explained in *Hassan v. City of New York*:

> [T]here's a difference between "intent" and "motive." "[A] defendant acts intentionally when he desires a particular result, without reference to the reason for such desire. Motive, on the other hand, is the reason why the defendant desires the result." 2 Harry Sanger Richards et al., *American Law and Procedure* § 8, at 6 (1922). In other words, "intent" asks whether a person acts "intentionally or accidentally," while "motive" asks, "If he did it

66

intentionally, *why* did he do it?" 1 John William Salmond, *Jurisprudence* § 134, at 398 (7th ed.1924) (emphasis in original); *see also Black's Law Dictionary* 881 (Bryan Garner ed., 10th ed. 2014) ("While motive is the inducement to do some act, intent is the mental resolution or determination to do it."). This fundamental "distinction between motive and intent runs all through the law." *Johnson v. Phelan,* 69 F.3d 144, 155 (7th Cir.1995) (Posner, C.J., concurring in part and dissenting in part).

804 F.3d 277, 297 (3d Cir. 2015).

The District Judge properly instructed the jury, for example, that to find Defendants guilty of wire fraud, the Government was required to prove they "knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations, or promises," and that they "acted with intent to defraud." J.A. 5119. This describes the conduct proscribed by the statute and the required *mens rea*. The intent to punish Mayor Sokolich may explain Defendants' motive—*why* Defendants intended to defraud the Port Authority in this case—but it is distinct from *mens rea* and is not a required element of any of the charged offenses. *See, e.g.*, *Pointer v. United States,* 151 U.S. 396, 417 (1894) ("The absence of evidence suggesting a motive for the commission of the crime charged is a circumstance in favor of the accused, to be given such weight as the jury deems proper; but proof of motive is never indispensable to conviction."); *United States v. Sriyuth*, 98 F.3d 739, 747 n.12 (3d Cir. 1996) ("[M]otive is always relevant in a criminal case, even if it is not an element of the crime."); *cf. United States v. Davis*, 183 F.3d 231, 244

67

(3d Cir. 1999) ("It is clear that the parties involved in this intrigue had different motives. . . . Davis contends that this disproves a conspiracy. We disagree. If they all agreed to interfere with a pending judicial proceeding, they are guilty of conspiracy. That is the difference between motive and intent."); *United States v. Harrison,* 942 F.2d 751, 756 (10th Cir. 1991) ("The goals of all the participants need not be congruent for a single conspiracy to exists, so long as their goals are not at cross purposes." (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990))).

Indeed, following the Third Circuit Model Jury Instructions, the District Judge charged the jury on this critical difference between motive and intent:

> Intent and motive are different concepts. Motive is what prompts a person to act. Intent refers only to the state of mind with which the particular act is done. Personal advancement and financial gain, for example, are motives for much of human conduct. However, these motives may prompt one person to intentionally do something perfectly acceptable, while prompting another person to intentionally do an act that is a crime. Motive is not an element of the offense with which a defendant is charged. Proof of bad motive is not required to convict. Further, proof of bad motive alone does not establish that the defendant is guilty. And proof of good motive alone does not establish that the defendant is not guilty. Evidence of the defendant's motive may, however, help you to determine his or her intent.

J.A. 5139; 3d Cir. Model. Crim. Jury Instr. § 5.04. The judge specifically instructed the jury that evidence of motive may be relevant to establishing *mens rea*, thus allowing a juror who found evidence of motive lacking to vote for acquittal. Defendants were free to argue—and did argue—that they were not motivated by any desire to punish Mayor Sokolich. The jury's guilty verdict necessarily demonstrates no juror found motive so lacking as to raise a reasonable doubt concerning Defendants' guilt. Moreover, as we have explained, the comprehensive and thorough jury charge created no risk that Defendants were convicted on the basis of lawful conduct.

And while the grand jury included language describing Defendants' motive to punish the mayor in the indictment, that language—which did not describe an essential element of the charged offense—was merely surplusage. Because the jury instructions did not modify the essential elements of the offenses as charged in the indictment, there was no constructive amendment. *See United States v. Repak*, 852 F.3d 230, 257–58 (3d Cir. 2017) ("An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." (quoting *United States v. Daraio*, 445 F.3d 253, 259–60 (3d Cir. 2006))).

Accordingly, we find no error in these instructions or the District Judge's response to the jury's question.

\*    \*    \*

69

Because Defendants' sufficiency challenges to their wire fraud and Section 666 offenses fail, and because we find any error in the jury instructions was at worst harmless, we will affirm Defendants' judgments of convictions as to the wire fraud and Section 666 offenses. We now turn to the civil rights counts.

**V.**

Finally, Defendants challenge the sufficiency of Counts 8 and 9 of the indictment. In those counts, the grand jury charged Defendants with conspiring to violate, and substantively violating, the civil rights of Fort Lee residents. It alleged "[t]he object of the conspiracy was to interfere with the localized travel rights of the residents of Fort Lee for the illegitimate purpose of causing significant traffic problems in Fort Lee to punish Mayor Sokolich," J.A. 124, and that Defendants "knowingly and willfully deprived the residents of Fort Lee of the rights, privileges, and immunities secured by the Constitution and laws of the United States, namely, the right to localized travel on public roadways free from restrictions unrelated to legitimate government objectives," J.A. 127. Defendants argue the substantive due process right the grand jury identified—"the right to localized travel on public roadways free from restrictions unrelated to legitimate government objectives"—is not clearly established and thus cannot form the basis of the civil rights offenses charged in Counts 8 and 9.

Defendants' attack on the sufficiency of Counts 8 and 9 of the indictment is a legal question over which our review is plenary. *See Willis*, 844 F.3d at 161 n.7. "[W]hether the alleged violation of substantive due process was clearly

70

established . . . is a question of law over which our review is unrestricted." *Mammaro v. N.J. Div. of Child Protection & Permanency*, 814 F.3d 164, 168 (3d Cir. 2016).

Section 241 makes it a crime for "two or more persons [to] conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States," and Section 242 makes it a crime for a person "under color of any law, statute, ordinance, regulation, or custom, to willfully subject[] any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 18 U.S.C. §§ 241–42.

"[I]n lieu of describing the specific conduct it forbids, each statute's general terms incorporate constitutional law by reference." *United States v. Lanier*, 520 U.S. 259, 265 (1997). The statutes' scope is limited to "rights fairly warned of, having been 'made specific' by the time of the charged conduct." *Id.* at 267. The Supreme Court has held that "the object of the 'clearly established' immunity standard is not different from that of 'fair warning' as it relates to law 'made specific' for the purpose of validly applying" the criminal civil rights statutes. *Id.* at 270. Accordingly, we apply the same test as in qualified immunity cases, asking whether the right allegedly deprived was clearly established. *See id.*

Before trial, Defendants moved to dismiss the indictment, arguing that there is no constitutional right to localized travel on public roadways and that, even if such a

71

right did exist, it had not yet been clearly established. As the District Court noted when denying the motion, our Court recognized a Fourteenth Amendment due process right to intrastate travel nearly three decades ago. *See Lutz v. City of York*, 899 F.2d 255, 268–70 (3d Cir. 1990). Specifically, in reviewing a city ordinance that prohibited cars from driving three or more times through certain overcrowded streets during evening hours, *see id.* at 257, we held there is "[a] due process right of localized movement on the public roadways," *id.* at 269, which we alternately described as "the right to move freely about one's neighborhood or town, even by automobile," *id.* at 268. We further held no other constitutional provision could provide the source of the right. *See id.* at 262–68 (rejecting Article IV Privileges and Immunities Clause, Fourteenth Amendment Privileges or Immunities Clause, rights of national citizenship, Commerce Clause, and Fourteenth Amendment Equal Protection Clause theories). We nonetheless upheld the ordinance because it was narrowly tailored to meet the significant city objectives of protecting public safety and reducing intense traffic congestion. *Id.* at 270.

Contrary to the District Court's holding, however, and according to the Supreme Court's qualified immunity precedent, *Lutz* alone could not have put Defendants on notice that they were violating a constitutional right. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "To determine whether the right is clearly established, we look at the state of

the law when the [conduct] occurred," *Fields v. City of Phila.*, 862 F.3d 353, 361 (3d Cir. 2017), here 2013. The Supreme Court has suggested that a single binding case from the defendant's jurisdiction is insufficient to give notice that certain conduct could lead to criminal punishment. *See Carroll v. Carman*, 135 S. Ct. 348, 350 (2014). Instead, "[w]e look first to applicable Supreme Court precedent." *L.R.*, 836 F.3d at 247–48. A relevant Supreme Court holding ends the inquiry. "[I]f none exists, it may be possible that a 'robust consensus of cases of persuasive authority' in the Court[s] of Appeals could clearly establish a right for purposes of qualified immunity." *Id.* at 248 (quoting *Mammaro*, 814 F.3d at 169).

The Supreme Court has never recognized an intrastate travel right. Far from a "robust consensus" in the Courts of Appeals that the right exists, the law across the circuits is uncertain. And most often our sister circuits have considered the matter in reviewing challenges to municipal residency requirements, not government action prohibiting free movement in public spaces, undermining the notice those opinions might have provided to Defendants as to the criminal nature of their conduct.

In addition to our opinion in *Lutz*,[19] the First, Second, and Sixth Circuits have recognized a right to intrastate travel, though they have described it at varying levels of generality. *See Cole v. Hous. Auth. of City of Newport*, 435 F.2d 807, 809

---

[19] We earlier recognized the right in *Wellford v. Battaglia*, 485 F.2d 1151, 1152 (3d Cir. 1973) (per curiam), where we struck down a durational residency requirement for mayoral candidates because it burdened potential candidates' fundamental "right to travel."

(1st Cir. 1970) (striking down city's two-year durational residency requirement for low-income housing on equal protection grounds for violating the "right to travel"); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648–49 (2d Cir. 1971) (striking down five-year durational residency requirement for admission to municipality's public housing on equal protection grounds for violating a "right to travel within a state"); *Johnson v. City of Cincinnati*, 310 F.3d 484, 495, 502–05 (6th Cir. 2002) (favorably citing *Lutz* to hold a city ordinance banning persons convicted of drug crimes from "drug-exclusion zones" violated the due process "right to travel locally through public spaces and roadways").[20]

On the other hand, the Fourth, Fifth, Seventh, Eighth, and Tenth Circuits have treated the question more skeptically, often hesitating to recognize a due process intrastate travel right and sometimes explicitly rejecting theories rooted in other constitutional provisions. *See Eldridge v. Bouchard*, 645 F. Supp. 749, 753–55 (W.D. Va. 1986) (rejecting challenge to regional salary differential for police officers, in part, because "the plaintiffs do not have a federally recognized fundamental right to intrastate travel" rooted in the Privileges or Immunities Clause of the Fourteenth Amendment, though suggesting an intrastate travel right may be implicated in durational residency cases), *aff'd*, 823 F.2d 546 (4th Cir. 1987); *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993) (upholding juvenile curfew ordinance even "assum[ing] without deciding that the right to move about freely [in public] is a fundamental right," noting

---

[20] The Government cites *Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016), as also recognizing the right, but this case post-dates the conduct at issue and could not have provided fair notice here. *See Fields*, 862 F.3d at 361.

"under certain circumstances, minors may be treated differently from adults"); *Wright v. City of Jackson*, 506 F.2d 900, 903–04 (5th Cir. 1975) (upholding fire department's continual residency requirement because it offended no fundamental right to intrastate travel); *Andre v. Bd. of Trustees of Vill. of Maywood*, 561 F.2d 48, 53 (7th Cir. 1977) (declining to "consider whether a right of intrastate travel should be acknowledged" because town's new continual residency requirement for public employment was not durational); *Townes v. City of St. Louis*, 949 F. Supp. 731, 735–36 (E.D. Mo. 1996) (holding ordinance blocking access to one city intersection to reduce crime would not violate due process intrastate travel right, assuming it exists), *aff'd*, 112 F.3d 514 (8th Cir. 1997); *D.L. v. Unified Sch. Dist. No. 497*, 596 F.3d 768, 776 (10th Cir. 2010) (per curiam) (rejecting substantive due process challenge to school district's continual residency requirement because "the constitutional rights at issue apply only to *inter*state travel, and the travel that Plaintiffs claim was restricted was *intra*state travel").

The D.C. Circuit is internally conflicted but has not yet set precedent. A plurality of the Court sitting en banc suggested a due process right to intrastate travel might exist but did not reach the question. *See Hutchins v. D.C.*, 188 F.3d 531, 538 (D.C. Cir. 1999) (en banc) (plurality opinion) (acknowledging "a hypothetical municipal restriction on the movement of its citizens, for example, a draconian curfew, might bring into play the concept of substantive due process," but declining to find a fundamental right implicated by a juvenile curfew ordinance, in part because juveniles do not have the same rights as adults). In separate opinions, another plurality concluded a right to intrastate travel exists and ought to be subject to intermediate scrutiny. *See id.* at 553 n.1

75

(Rogers, J., concurring in part and dissenting in part) (listing views expressed by each presiding judge on the "fundamental right to movement").

Simply put, although four circuits (including our own) have found some form of a constitutional right to intrastate travel, there is hardly a "robust consensus" that the right exists, let alone clarity as to its contours. Although *Lutz* is both clear and binding in our jurisdiction, this area of law as a whole is far from settled. Based on the Supreme Court's qualified immunity precedent, we hold the District Court erred in concluding *Lutz*, standing alone, provided fair warning that Defendants conduct was illegal, especially in view of the state of the law in our sister circuits. *See Carroll*, 135 S. Ct. at 351. "[W]hether or not the constitutional rule applied by the court below was correct, it was not 'beyond debate.'" *Id.* at 352 (quoting *Stanton v. Sims*, 571 U.S. 3, 10–11 (2013) (per curiam)).

Accordingly, we will reverse and vacate Defendants' civil rights convictions and remand with instructions to dismiss Counts 8 and 9 of the indictment under Federal Rule of Criminal Procedure 12(b). *See Cicco*, 938 F.2d at 446–47. Because we reverse and vacate Defendants' convictions, we need not reach their arguments concerning the jury instructions on the civil rights counts.

## VI.

For the foregoing reasons, we will affirm Defendants' judgments of convictions as to the wire fraud and Section 666 counts (Counts 1 through 7), and we will reverse and vacate only as to the civil rights counts (Counts 8 and 9). Because we

have reversed and vacated two counts of the indictment, we will vacate Defendants' sentences on the remaining counts of convictions.[21]   We will remand with instructions to dismiss

---

[21] The Supreme Court has explained that resentencing is appropriate where Defendants successfully appeal some but not all of the counts of conviction:

> [Sentencing package] cases typically involve multicount indictments and a successful attack by a defendant on some but not all of the counts of conviction. The appeals court, in such instances, may vacate the entire sentence on all counts so that, on remand, the trial court can reconfigure the sentencing plan to ensure that it remains adequate to satisfy the sentencing factors in 18 U.S.C. § 3553(a). In remanded cases, the Government relates, trial courts have imposed a sentence on the remaining counts longer than the sentence originally imposed on those particular counts, but yielding an aggregate sentence no longer than the aggregate sentence initially imposed. Thus the defendant ultimately may gain nothing from his limited success on appeal, but he will also lose nothing, as he will serve no more time than the trial court originally ordered.

*Greenlaw v. United States*, 554 U.S. 237, 253–54 (2008) (citations omitted); *United States v. Hodge*, 870 F.3d 184, 188 (3d Cir. 2017) (remanding "for requisite resentencing" where some, but not all, counts of convictions were vacated).

only Counts 8 and 9 of the indictment and to resentence Defendants on the remaining counts of conviction.